# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JEREMIAH MITCHELL                :

     Plaintiff,                      :

                           Case No. 3:09cv00276

  vs.                            :

                           District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,               :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,         :

     Defendant.                      :

## REPORT AND RECOMMENDATIONS[1]

## I.      INTRODUCTION

### A.      <u>Social Security Programs</u>

"The Federal Government provides benefits to disabled persons under two distinct programs administered by the Social Security Administration." *Bowen v. City of New York*, 476 U.S. 467, 469 (1986). One program provides Disability Insurance Benefits (DIB) "to disabled persons who have contributed to the program and who suffer from a mental or physical disability." *Id.* at 470. The other program provides Supplemental Security Income benefits to indigent disabled persons. *Id.*

Within the DIB program is a subset of benefits available to a "Disabled Adult

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Child" who typically – through want of age and work experience – has contributed enough to be eligible to receive DIB.  A Disabled Adult Child can sometimes meet the DIB contribution requirement essentially by dint of their parent's hard work and earnings, and the parent's resulting contributions to the DIB program.  *See* 42 U.S.C. §402(d)(1). The parent's DIB contributions can inure to the benefit of a Disabled Adult Child when the parent either becomes entitled to DIB or dies while fully or currently insured for DIB purposes.  *See id.*; *see also* 20 C.F.R. §404.350(a).

To be eligible to receive benefits as a Disabled Adult Child, a person must apply for benefits, must be under a "disability" as defined by Social Security Act before attaining age twenty-two,[2] and must meet other eligibility criteria.  *See* 42 U.S.C. §§402(d)(1), 423(a).

### B.      Plaintiff's Applications for Benefits

Plaintiff Jeremiah Mitchell was entitled to receive Disabled Adult Child benefits beginning in April 2003 when he was nineteen years old.  (Tr. 18, 99-100).  His eligibility terminated in July 2003.  *See id.*  This brief period of eligibility for Disabled Adult Child benefits is not at issue in the instant case.

Plaintiff's father Robert Dean Mitchell died in January 2004.  (Tr. 18, 51).  His many years of contributions to the DIB program made him fully insured for DIB purposes on the date of his death.  *Id.*

---

[2]  There are additional ways to meet the age requirement for obtaining Disabled Adult Disability benefits, *see* 42 U.S.C. §402(d), which do not apply in the present case.

2

In February 2004, when Plaintiff was still age nineteen, he filed an application for Disabled Adult Child benefits based on the earnings record of his father. (Tr. 45). Previously, in 2002, he had also filed an application for Supplemental Security Income asserting that he was under a disability "due to diabetes and seizures." *Id*. An Administrative Law Judge issued a decision concluding that Plaintiff was not under a disability and was not eligible for benefits. (Tr. 45-53). Plaintiff did not seek further review of the Administrative Law Judge's decision and that decision is not before the Court in the instant case. *See* Doc. #8 at 1, n.1.

On January 27, 2005, Plaintiff filed an application for re-entitlement to Disabled Adult Child benefits along with an application (his second) for Supplemental Security Income. (Tr. 18). Plaintiff asserted that beginning on May 1, 1985, he was under a disability due to diabetes, seizures, and "being a slow learner." (Tr. 448).

After initial administrative denials, Plaintiff's applications proceeded to two administrative hearings held by Administrative Law Judge (ALJ) Melvin A. Padilla. (Tr. 461-67; 468-99). In July 2008 ALJ Padilla issued the decision at issue in the instant case. (Tr. 18-31). He concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act and, as a result, Plaintiff was not eligible for Disabled Adult Child benefits or Supplemental Security Income. *Id*.

Plaintiff unsuccessfully challenged ALJ Padilla's decision in the Appeals Council of the Social Security Administration. ALJ Padilla's decision therefore became the Social Security Administration's final decision concerning Plaintiff's non-eligibility for

Adult Child Disability benefits and Supplemental Security Income.

### C. **The Present Case**

Plaintiff brings the present case seeking a reversal of ALJ Padilla's decision and a remand to the Social Security Administration for payment of benefits.

The Commissioner seeks an Order affirming the ALJ's decision.

This Court has jurisdiction to adjudicate the parties' dispute over ALJ Padilla's decision since it constitutes the Social Security Administration's final non-disability decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #5), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), the administrative record, and the record as a whole.

## II. BACKGROUND

### A. **Plaintiff's Vocational Profile and Hearing Testimony**

Plaintiff's age (twenty-four years old) on the date of ALJ Padilla's decision placed him in the category of a "younger individual" as defined by Social Security Regulations. *See* 20 C.F.R. §§404.1563, 416.963[3]; *see also* Tr. 29. He has a high school education through a special education program and home schooling. *See* 20 C.F.R. §416.964(b)(4); *See* also Tr. 106-45, 485. Plaintiff's past employment has been sporadic and short-term.

---

[3] The remaining citations will identify only the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

4

*See* Tr. 29, 194, 473-74.  At the time of ALJ Padilla's second hearing, Plaintiff had last

worked as a bus boy.  (Tr.  473-74).

Plaintiff testified during the second administrative hearing that he lives with his

mother, step-father, and a cousin.  (Tr. 471).  He has never earned a driver's license and

does not drive a car.  (Tr. 472).  When asked if he knew how to drive, Plaintiff answered:

> I'm not exactly sure but I know a little.  Like, like my father, he, he
> tried to – makes me – once made me ride on the riding lawn mower to mow
> the grass.  I've done it a couple of times ... and then I stopped ... when I ran
> into the shed once.

*Id*.  Plaintiff explained that he had never taken the test for a driver's license due to

seizures he sometimes suffers.  *See* Tr. 483.

When ALJ Padilla asked Plaintiff why he thought he was disabled, Plaintiff

responded, "What exactly is disabled?"  (Tr. 474).  ALJ Padilla then asked, "Why, why

can't you work?"  *Id*.  Plaintiff answered, "I have no idea."  *Id*.

When the ALJ asked Plaintiff if he had any emotional problems, Plaintiff

apparently did not understand the question.  (Tr. 477).  The ALJ then asked, "Do you

have any nerve problems or emotional problems, psychological problems?"  *Id*.  Plaintiff

responded, "Oh, I can't think of any."  (Tr. 477).

Plaintiff testified that he did not know who sent him to see Dr. Rahman (his

treating psychiatrist, Tr. 422), and he did not understand why he sees Dr. Rahman.  (Tr.

477-78).  He also did not know how often or how frequently he saw Dr. Rahman.

Plaintiff explained, "Oh, pretty much like I said, my mom is the one who, who is

5

informed about it all.  I just go and see him."  (Tr. 478).

As to his daily activities, Plaintiff testified that he did not wash dishes, he sometimes mopped or swept, he did not run the vacuum cleaner, he did not do laundry, and he did not make his bed.  (Tr. 479-80).  He did go grocery shopping with his mother; he cooked some things but could not follow a recipe.  He went to church on Sundays.  He sometimes went to movies, watched tv, and played video games.  He rode his bike and walked.  He liked to listen to music, and he searched for video games and music on his mother's computer.  He sometimes trimmed the yard after his dad (his step-father) mowed it.  He hung out with friends but did not know their ages.  (Tr. 479-81, 486-87).

### B. <u>Medical Opinions</u>

**<u>George Schulz, Ph.D.</u>**  In April 2005 Dr. Schulz performed a psychological examination of Plaintiff at the request of the Ohio Bureau of Disability Determination.  (Tr. 277-84).

Plaintiff reported to Dr. Schulz that he lived at home with his mother and stepfather.  (Tr. 278).  The longest time he had ever held a job was two months due to not getting along with co-workers.  Plaintiff also reported that he went to bed at 3:00 a.m. and woke up at 3:00 p.m.  He played video games, watched television and attended church regularly.  (Tr. 279).  He reported no friends.  He shopped with his family.  His stepfather took care of all household finances, and Plaintiff did not do yardwork or household repairs.  *Id*.

Dr. Schulz reported that Plaintiff was cooperative, his speech was normal and

6

relevant, and he had no fragmentation of thoughts or loosening of associations.  (Tr. 279).

He denied hallucinations or psychotic symptoms, and he denied phobias, obsessions, or

delusions.  Dr. Schulz observed that Plaintiff's affect was appropriate and congruent, his

mood was euthymic, he was oriented and alert, and he did not show any signs of

confusion or lack of awareness.  Dr. Schulz noted that Plaintiff reported feeling depressed

within the past seven days.  *Id*.

Dr. Schulz tested Plaintiff's cognitive abilities using the WAIS-S (Wechsler Adult

Intelligence Scale).  Plaintiff's results: Verbal IQ of 78, Performance IQ of 92, and Full

IQ of 84.  (Tr. 280).  On the WMSIII (Wechsler Memory Scale), Plaintiff's memory was

in the normal range.  His reading comprehension on the WJR (Woodcock-Johnson

Revised) was in the average range.  (Tr. 280).

Dr. Schulz diagnosed Plaintiff with depressive disorder NOS (not otherwise

specified), borderline intellectual functioning, diabetes, and seizure disorder.  He assessed

Plaintiff's Global Assessment of Functioning[4] (GAF) at 60, indicating "moderate

symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g.,

few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of

Mental Disorders, 4th ed., Text Revision at p. 34 (DSM-IV-TR).  (Tr. 280).

Dr. Schulz opined that Plaintiff's ability to relate to others was minimally

---

[4] Health care professionals use the GAF scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34.

impaired; his ability to understand, remember, and follow instructions was moderately impaired.  Dr. Schulz believed that Plaintiff was minimally impaired in his ability to maintain attention, concentration, and perform simple, repetitive tasks and minimally impaired in his ability to withstand the stress and pressure of normal work activity on a regular and sustained basis.  (Tr. 281-82).

**Catherine Flynn, Psy.D.**  In April 2005 Dr. Flynn, a record-reviewing psychologist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment.  (Tr. 293-308).  According to Dr. Flynn, Plaintiff had no restrictions in the activities of daily living, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 303).  Dr. Flynn believed Plaintiff was mildly limited in his ability to maintain social functioning.  *Id.*  He was moderately limited in his ability to understand, remember, and carry out detailed instructions; to make simple work-related decisions; to interact appropriately with the general public; and in his ability to accept instructions and respond appropriately to criticism from supervisors.  (Tr. 305-06).

Dr. Flynn further concluded that Plaintiff could do one- and two-step tasks in an environment that did not require direct contact with the general public or constant contact with coworkers.  (Tr. 307).

Psychologist Dr. Hoyle reviewed the record at the request of the Ohio Bureau of Disability Determinations (Ohio BDD) and stamped her agreement with Dr. Flynn's opinion.  (Tr. 293, 307).  Dr. Hoyle provided no written explanation in support of her

8

agreement with Dr. Flynn.  *Id*.

**Philip J. Gibeau, Ph.D.**  In August 2005 Dr. Gibeau examined and evaluated
Plaintiff at the request of a Bureau of Vocational Rehabilitation counselor.  (Tr. 412-18).
Dr. Gibeau reported that Plaintiff was an unreliable historian and that he did not
understand why he was being evaluated.  (Tr. 412).

Plaintiff informed Dr. Gibeau that he had been home schooled after the tenth grade
and did not participate in any extra curricular activities.  Plaintiff had never been married
and had not fathered any children.

Plaintiff related feelings of sadness over the death of his father.  (Tr. 413).  Dr.
Gibeau reported, "When asked about any suicidal thoughts or attempts, he paused and
stated 'sometimes I wish I was dead due to diabetes – I'd rather be dead than alive – but I
never made any attempts.'"  *Id*.   Plaintiff did not understand what sexual abuse was but,
once it was explained, he denied experiencing any.  (Tr. 413).  Plaintiff's stressors
included diabetes and his step-father.   (Tr. 414).  He identified his support system as his
friends at church and God.  *Id*.

Plaintiff could not answer work-related questions about "disability" or
"compensation" because he did not understand those concepts.  *Id*.

Plaintiff told Dr. Gibeau that he was trying to get a job with the help of the Bureau
of Vocational Rehabilitation.  (Tr. 414).  He also wanted to be a "wrestler in WWC."  *Id*.
Plaintiff noted that he could work with others if he could trust them.  *Id*.  Dr. Gibeau
observed that Plaintiff did not engage in much eye contact; he was often submissive,

restless and had problems providing facts to Dr. Gibeau; he exhibited a slightly blunted and flattened affect and was anxious. His mood was depressed and pessimistic. (Tr. 414).

According to Dr. Gibeau, Plaintiff exhibited periods of confusion and lethargy during the evaluation. His attention span was limited. Dr. Gibeau wrote that Plaintiff's "associations were logical, relevant and goal oriented for simple tasks but marked by circumstantiality, blocking, perseveration and paucity of content for more complex tasks." (Tr. 415). Dr. Gibeau also reported:

> "His fund of information appeared poor and his estimated level of intelligence was in the retarded range. There were noteworthy deficits to both his recent and remote memory functions. His reasoning skills were concrete in nature. Insight as to his situation appeared absent and his judgment must be regarded as being impaired."

*Id.* Intelligence testing resulted in a Verbal IQ of 75, Performance IQ of 99, and full scale IQ of 85. Dr. Gibeau noted, "The 24 point discrepancy between his Verbal and Performance scores is often considered significant for problems in his left cerebral hemisphere. Analysis of his scaled scores revealed greatly uneven mental functioning." *Id*. Results of achievement testing indicated "a developmentally handicapped condition (less than the 20th percentile) in the areas tested." (Tr. 416).

Dr. Gibeau diagnosed Plaintiff with a dysthymic disorder, anxiety disorder, learning disorder NOS, and borderline personality disorder. (Tr. 417). Dr. Gibeau assessed Plaintiff's GAF at 50, *id*., indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." DSM-IV-TR at p. 34.

10

Dr. Gibeau opined Plaintiff could do best in learning in a hands-on way; he would take a longer time to learn and retain basic job skills; he could not function in an independent manner or plan his work day; he would likely have problems working with others and adjusting to change; and he had low tolerance to stress that "may cause him to overreact to authority figures." (Tr. 417).  Dr. Gibeau recommended that Plaintiff should undergo out-patient counseling for depression and anxiety, and that he engage in part-time work "until he is capable of meeting job demands." (Tr. 418).  Dr. Gibeau listed several possible job categories for Plaintiff to consider, for example, janitorial services, landscaping services, and building or house painting.

In June 2006 Dr. Gibeau acknowledged in a letter that he had examined Plaintiff on one occasion (in August 2005).  Dr. Gibeau explained:

> "At the time of the evaluation, I found him to be totally disabled due to the limitations indicated in my report.  He is in need of psychological counseling, a medication evaluation and a work evaluation to better determine his skills.  He will need a job coach to assist him in responding to any job.  His skills are few and his strengths are limited.  He will need considerable preparation for entering the competitive job market."

(Tr. 411).

**Mahmood Rahman, M.D.**   After seeing Plaintiff on January 24, 2008, Plaintiff's treating psychiatrist Dr. Rahman completed a Mental Residual Functional Capacity Assessment.  He essentially opined that Plaintiff was under a disability.  *See* Tr. 420-21. Dr. Rahman noted Plaintiff was markedly or extremely limited in all categories of mental-work abilities. *Id.*

11

In May 2008 Dr. Rahman answered written interrogatories. (Tr. 422-30). He reported that he had first seen Plaintiff on January 24, 2008. (Tr. 422). He opined that Plaintiff had very poor interpersonal relationships because he felt everyone should subscribe to his opinions and values. "He cannot tolerate dissent." (Tr. 424). Dr. Rahman noted that Plaintiff was very depressed and stubborn. *Id.* Dr. Rahman believed that Plaintiff could not be prompt and regular, and he could not respond appropriately to supervision or coworkers. (Tr. 425). He could not deal with work pressures due to a learning disorder, and he would require constant work supervision as a result of "his inability to concentrate, his distractibility, and his erratic inappropriate behavioral & responses…." (Tr. 426). According to Dr. Rahman, Plaintiff's anxiety and agitation prevented him from behaving in an emotionally stable manner. (Tr. 427). Plaintiff's emotional behavior limited his ability to act predictably in social situations and to demonstrate reliability. *Id.* Plaintiff could not maintain attention and concentration and was unable to be punctual and maintain regular attendance. He would frequently decompensate. (Tr. 428). Changes in routine caused Plaintiff to be frustrated and confused. Dr. Rahman believed that Plaintiff would be very distracted by co-workers and that he tends to become stubborn and defiant when criticized. (Tr. 429-30).

Dr. Rahman also completed a Psychiatric Review Technique Form. (Tr. 431-38). According to Dr. Rahman, Plaintiff had marked restrictions of activities of daily living, extreme difficulties in social functioning, extreme deficiencies of concentration, persistence or pace, and three episodes of decompensation, each of extended duration. (Tr.

12

438).

## III.   ADMINISTRATIVE REVIEW

### A.   "Disability" Defined

As noted previously, *supra*, §I(A), to be eligible for Disabled Adult Child benefits

or Supplemental Security Income, a claimant must be under a "disability" as defined by

the Social Security Act.  *See* 42 U.S.C. §§423(a), (d)(1), 1382c(a).  The definition of the

term "disability" is essentially the same under the DIB and SSI programs.  *See Bowen*, 476

U.S. at 469-70.  Narrowed to its statutory meaning, a "disability" includes only physical or

mental impairments that are both "medically determinable" and severe enough to prevent

the applicant from (1) performing his or her past job and (2) engaging in "substantial

gainful activity" that is available in the regional or national economies.  *See Bowen*, 476

U.S. at 469-70.

### B.   ALJ Padilla's Decision

ALJ Padilla evaluated Plaintiff's disability status using the five-Step

sequential evaluation procedure required by Social Security Regulations.  *See* Tr. 19-31;

*see also* 20 C.F.R. § 416.920(a)(4).  The ALJ's more pertinent findings arose at Steps 2

through 5 of his sequential evaluation.

At Step 2 the ALJ concluded that Plaintiff had the severe impairments of "severe

diabetes, diabetes related seizure disorder, and a developmental delay verses borderline

intellectual functioning."  (Tr. 22).  The ALJ recognized that Plaintiff had been diagnosed

13

with diabetes when he was just thirteen months old.  *Id.*

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (Tr. 25).

At Step 4 the ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> [T]he claimant has the residual functional capacity to [sic] the full range of exertion as defined in 20 CFR 404.1567 and 416.967 featuring: 1) no ladders, scaffolds, or unprotected heights; 2) no operation of hazardous machinery or work near them; 3) unskilled, simple repetitive tasks; and 4) no need for any significant academic skills such as writing or reading as part of his job duties.

(Tr. 27).  The ALJ, moreover, assumed at Step 4 that Plaintiff "... has no past relevant work that he could do, consistent with his functional limitations."  (Tr. 29).

At Step 5 the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (Tr. 29).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff had not been under a disability since the termination of his prior entitlement to Disabled Adult Child benefits and that he was therefore not eligible for Adult Child Benefits or Supplemental Security Income. (Tr. 31).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's final decision proceeds along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings.  *Blakley v. Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009);

*see Bowen v. Commissioner of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Commissioner of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Commissioner of Soc. Sec*., 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbets v. Commissioner of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[Even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbets*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746; citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     DISCUSSION

### A.     The Parties' Contentions

Plaintiff contends that the ALJ erred in finding that he was not under a disability due to his mental impairments.  The ALJ's error, according to Plaintiff, occurred through his decision to credit the opinions of psychologist Dr. Schulz, a one-time examiner, and the opinions of two record-reviewers, Drs. Flynn and Hoyle.  Plaintiff further asserts that the ALJ erred by not crediting the opinions of his treating psychiatrist Dr. Rahman and the opinions of Dr. Gibeau.

The Commissioner argues that substantial evidence supports the ALJ's conclusion that Plaintiff was not under a disability before attaining age twenty-two and that he thereafter remained capable of performing a significant number of jobs available in the national economy.

### B.     Evaluating Medical Source Opinions

Social Security Regulations and Rulings describe the legal criteria ALJs must apply to their evaluation of the opinions provided by treating physicians, a one-time examining physicians, or a record-reviewing physical.

The Regulations generally favor the opinions of treating physicians "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)...."  20 C.F.R. §416.927(d)(2).  Due to this, the treating physician rule mandates the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a

16

nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Id*; *see Blakley,* 581 F.3d at 406; *see also Wilson*, 378 F.3d at 544. Yet complete deference to treating medical sources is not automatic. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can – under some circumstances – be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including

17

supportability, consistency, and specialization.  *See* 20 C.F.R. §404.927(d), (f); *see also* Ruling 96-6p at *2-*3.

### C.    Analysis

The ALJ began his assessment of Plaintiff's Residual Functional Capacity by noting that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSR [Social Security Rulings] 96-2p, 96-5p, 96-6p and 06-03p."  (Tr. 27).  The ALJ thus cited the applicable Regulations and Rulings, but he did not separately describe the legal criteria described in these Regulations and Rulings.  The Court must therefore scrutinize the ALJ's decision to determine whether he applied the correct legal criteria when evaluating the medical source opinions.  *See Bowen*, 478 F.3d at 746.

The ALJ "essentially follow[ed] the recommendations" of Dr. Schulz, who examined Plaintiff for the Ohio BDD, and Drs. Flynn and Hoyle, who reviewed the record at the Ohio BDD's request.  (Tr. 26).  The ALJ gave "considerable weight" to the opinions of these non-treating medical sources, finding their opinions "consistent for the most part with the clinical data and descriptive information about the claimant's level of function in typical activities."  (Tr. 26).

In contrast, the ALJ placed little or no weight on the opinions of Plaintiff's treating psychiatrist, Dr. Rahman, or on the opinions the one-time evaluating psychologist, Dr. Gibeau.  (Tr. 24).  The ALJ explained, " the opinions of those doctors [Drs. Rahman and [Gibeau] are given little weight as they are poorly supported by any consistent clinical data

18

and are clearly inconsistent with school records, the more realistic report of Dr. Schulz, or

even the claimant's own testimony."  (Tr. 24).  The ALJ also wrote:

> "All-in-all, the evaluations by Dr. Gibeau and Dr. Rahman which
> suggest the claimant is incapable of any work due to serious emotional
> problems (depression and anxiety) are totally lacking in credibility as they
> are poorly supported clinically, and inconsistent with other substantial
> evidence, including this individual's own statements about his emotional
> health.  Likewise, based on this record, it is found that he does not have a
> 'severe' impairment in the form of depression or anxiety disorder.  Neither
> controlling nor deferential weight is accorded to the opinions of Dr. Gibeau
> and Dr. Rahman.

(Tr. 25).  The ALJ later observed:

> "Generally, the opinions of Dr. Schulz and the [Ohio] BDD reviewing
> psychologists are entitled to considerable weight as they are consistent for
> the most part with the clinical data and descriptive information about the
> claimant's level of function in typical activities.  However, the moderate
> restrictions with respect to concentration, persistence, or pace, are found to
> be warranted in view of the history of developmental delays and academic
> problems (even if some of these problems have largely been a matter of his
> low motivation)."

(Tr. 26-27).  The ALJ additionally wrote:

> As already noted, the above restriction, moderate in nature, give the
> claimant a good deal of benefit of doubt and are quite generous in
> comparison to the basically not severe degree of impairment indicated by Dr.
> Schulz and the [Ohio] BDD reviewing psychologists (notwithstanding that
> the assessments of Dr. Schulz and the [Ohio] BDD reviewing psychologists
> are much more realistic than the grim but poorly supported opinions of Dr.
> Gibeau and Dr. Rahman."

(Tr. 28).

The ALJ fails to state what evidence in the record actually supports the findings of

Dr. Schulz and that of the Ohio BDD reviewers, and he fails to even mention or give

reasons for rejecting the objective clinical evidence – such as Plaintiff's school records, intelligence testing, achievement testing, and personality testing (as discussed further below) – that supported the findings and opinions provided by Plaintiff's treating specialist, Dr. Rahman, and by examining psychologist, Dr. Gibeau.  The ALJ's reasoning does not refer to specific evidence, instead referring to broad categories of evidence such as "school records" (Tr. 24) and making broad observations such his finding that Dr. Rahman's opinions were "poorly supported clinically" without discussing what led him to that conclusion.  "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how these reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243 (quoting in part *Wilson*, 378 F.3d at 544) (internal punctuation omitted). Indeed, "Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §404.1527 and 416.927.  Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify discrepancies and to explain why it is the treating physician's opinion gets the short end of the stick." *Friend v. Commissioner of Soc. Sec.*, unpublished dec., 2010 WL 1725066 at *8 (6th Cir., April 4, 2008)(citing *Blakley*, 581 F.3d at 408)(other citation omitted).

        "'In the absence of an explicit and reasoned rejection of an entire line

of evidence, the remaining evidence is 'substantial' only when considered in isolation.  It is more than merely 'helpful' for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review.'"

*Hurst v. Secretary of HHS*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v.*

*Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

The Commissioner contends that the ALJ provided good reasons for not relying on

the opinions of Dr. Rahman and Dr. Gibeau.  The Commissioner reasons:

> "The ALJ explained that he reasonably gave these opinions little weight because they were not supported by any clinical data and were inconsistent with school records (Tr. 24).  In addition, the ALJ did not rely on Dr. Rahman's opinion because his notes contain little information about Plaintiff's condition, and, in fact, do not even contain the results of a mental status examination (Tr. 24, 421-38).  Where a physician's conclusion regarding a claimant's capacity contains no substantiating medical data or other evidence, the ALJ is not required to credit such opinions."

(Doc. #8 at 68).  These contentions overlook the need for an ALJ to specify the evidence

that supported his assessment of the medical source opinions rather than rejecting those

opinions by referring to broad categories of evidence.  *See Hurst v. Secretary of HHS*, 753

F.2d at 519; *see also Friend*, 2010 WL 1725066 at *8; 20 C.F.R. §416.927 ("We will

always give good reasons in our notice of determination or decision for the weight we give

your treating source's opinions.").

In addition, the ALJ overlooked the similarity between Plaintiff's testimony and Dr.

Rahman's opinions.  The ALJ essentially took Plaintiff's testimony out of context and

misinterpreted it to cast doubt on Dr. Rahman's opinions.  He wrote:

> "Remarkably, the claimant's testimony raised a lot of doubts about

21

> the treatment relationship with Dr. Rahman.  He testified that he could not
> identify any emotional problems.  He said that he did not know why he was
> seeing Dr. Rahman or even who sent him to that psychiatrist.  He was not
> even sure that he had seen this doctor even when the ALJ reminded him that
> his was a doctor with Indian ethnicity…."

(Tr. 24).

Rather than conflicting with Dr. Rahman's opinions, as the ALJ found, Plaintiff's testimony tends to confirm his cognitive and adaptive difficulties.  Plaintiff testified that he did not know who sent him to Dr. Rahman or why he saw him and that his mother was "the one who knows all of it."  (Tr. 477).  Plaintiff explained that he saw many people and that he did not know which one was Dr. Rahman.  (Tr. 478).  ALJ Padilla asked Plaintiff about seeing an "Indian doctor by the name of Dr. Rahman."  *Id*.  Plaintiff answered that he did not know.  *Id*.  When asked by his attorney, Plaintiff stated that he was not sure what being an Indian doctor meant.  (Tr. 485).

Plaintiff's lack of understanding about his treatment with Dr. Rahman was consistent with the clinical evidence in the record.  For example, Dr. Gibeau – who performed numerous objective psychological tests on Plaintiff – found that his fund of information was poor and that a twenty-four point discrepancy between his Verbal and Performance IQ scores indicated "greatly uneven mental functioning."  (Tr. 415).  These findings, moreover, were consistent with testing done by Xenia Community Schools in 1997.  *See* Tr. 110, 123.

In addition, Dr. Gibeau reported that Plaintiff's "long term verbal memory was significantly below average and he had great difficulty in the recall of names, dates, and

events." (Tr. 416).  Based on testing, Dr. Gibeau noted that Plaintiff's "knowledge of verbal meanings was significantly below average and there should be problems in both his receptive and expressive communication….  Overall, his performance was indicative of better performance than verbal skills with problems in communication, reasoning, attention/concentration, recall of information, making decisions and forming new associations." *Id*.  Dr. Gibeau reported that Plaintiff did not understand why he was being evaluated, and he did not understand what "sexual abuse" meant.  (Tr. 412-13).  Plaintiff's testimony during the ALJ's hearing similarly revealed that he did not understand the word "disability."  (Tr. 474).  An interviewer for the Ohio BDD noted that Plaintiff "clearly didn't understand everything that was asked and relied upon his mother to answer for him."  (Tr. 147).

The results of the intelligence testing administered by Dr. Gibeau were consistent with school testing.  This supports the indication in Plaintiff's testimony that he has significant, if not severe, cognitive deficiencies in understanding verbal communication.  Dr. Gibeau, moreover, wrote that Plaintiff's performance on the intelligence testing was "indicative of better performance than verbal skills with problems in communication, reasoning, attention/concentration, recall of information, making decisions, and forming new associations."  (Tr. 416).  Achievement testing demonstrated that Plaintiff was in the developmentally handicapped range.  *Id*.  Questions on personality testing revealed:

> His clinical personality pattern indicates a long term depression,
> beliefs of inadequacy, feelings of worthlessness, and low self-esteem.....  He
> exhibits a disregard for the rights of others and for society in general.  He

23

can show periods of being belligerent, intimidating and domineering in his behavior toward others…. He exhibits a pervasive pattern of negativistic attitudes and passive resistance to demands for adequate performance. He is likely to complain of being misunderstood and unappreciated by others. He may alternate between hostile defiance and contrition…. He is slow to make decisions without the advice and reassurance of others. He has difficulty doing things on his own because of a lack of selfconfidence….

(Tr. 417).

Returning to Dr. Schulz, the ALJ credited his opinions by observing that Dr. Schulz's assessment was supported by the clinical and objective evidence. Without any meaningful explanation as to why the ALJ believed Dr. Schulz's assessment deserved "considerable weight," his decision is unmoored from substantial supporting evidence.

To the extent the ALJ relied on the opinions of two non-examining, record-reviewing Ohio BDD medical sources (Drs. Flynn and Hoyle) as grounds for crediting Dr. Schulz's opinions, the ALJ's decision is not supported by substantial evidence. This is so because these non-treating medical sources reviewed the record and formed their opinions in April 2005 and September 2005, before the later-written reports and opinions of Drs. Rahman and Gibeau. *See Sherman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *see also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Lastly, the ALJ also relied on Plaintiff's ability to engage in certain daily activities as another reason for rejecting Dr. Rahman's and Dr. Gibeau's opinions. The ALJ recognized that Plaintiff engaged in a wide range of leisure activities, including using a "computer, surfing the NET, playing video games, watching television and movies, socializing, riding a bike, and listening to music." *Id.* The ALJ additionally noted that

24

Plaintiff's school records "actually suggest about average reading skill, notwithstanding his seemingly difficult time with academics." *Id.* The ALJ noted that poor motivation may be a large factor in Plaintiff's "apparently limited" academic skills. (Tr. 26). Yet in support of this, the ALJ repeatedly remarked throughout his decision, *see* Tr. 23, 24, 26, 28, that Plaintiff's school records indicated he could conform to authority and be well-behaved, citing to one remark in Plaintiff's March 2004 Individualized Education Plan. *See* Tr. 133. The ALJ ignored or overlooked that other information found in Plaintiff's Individual Education Plan was consistent with the opinions of Drs. Rahman and Gibeau.

When assessing Plaintiff's need for special education at age eighteen, the school evaluation team reported that he had "exhibited difficulty learning in a traditional school setting for most of his academic career." (Tr. 122). He had also "exhibited difficulties maintaining interpersonal relationships with peers and others throughout his academic career." *Id.* He "becomes angry, aggressive and obstinate when he becomes frustrated with tasks that are part of the daily routine such as attending school and participating appropriately." *Id.* In light of such evidence, the ALJ erred by picking and choosing portions of the record which supported his non-disability decision rather while ignoring or overlooking evidence consistent with the opinions of Drs. Rahman and Gibeau. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002). Moreover, the ALJ's failure to account for the evidence confirming the

25

opinions of Drs. Rahman and Gibeau constituted the same type of error described in

*Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235 (6th Cir. 2002):

> "[T]he ALJ's selective inclusion of only those portions of the report
> that cast Howard in a capable light suggests that he only considered part of
> the report in formulating his conclusion that Howard 'need[s] to perform
> work of a simple and relatively nonstressful nature.' As a result, we
> conclude that the RFC does not accurately describe Howard's abilities and
> that the ALJ's decision, which is based upon it, is not supported by
> substantial evidence.

276 F.3d at 240-41.

Accordingly, Plaintiff's Statement of Errors is well taken.

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42

U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501

U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined effect

of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17

F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence

of disability is not overwhelming and because the evidence of a disability is not strong

while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

26

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to the problems discussed above. Supra, §V.  On remand the ALJ should be directed to (1) evaluate the medical source opinions of record under the legal criteria applicable mandated by the Commissioner's Regulation and Rulings, and by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for Adult Child Disability benefits and/or Supplemental Security Income.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The ALJ's decision be vacated;

2.     No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act;

3.     This matter be remanded to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. §405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.     The case be terminated on the docket of this Court.


July 7, 2010                                             s/Sharon L. Ovington
                                                        Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).